UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIETEC CO., LTD.,

     Plaintiff,

v.

OSIRIUS GROUP, LLC,

     Defendant.

Case No. 2:17-cv-10372
Honorable Laurie J. Michelson
Magistrate Judge David R. Grand

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS [12]**

---

This case presents an interesting issue as to what damages a seller may recover under the Uniform Commercial Code.

In 2014, Plaintiff Dietec Co., Ltd., contracted with Defendant Osirius Group, LLC, to design and manufacture dies that would be used to make auto parts. The purchase orders for the dies provided that Osirius would pay as Dietec hit various performance milestones. For instance, Osirius was to pay Dietec 25% of the price of the dies "after casting." Dietec says Osirius did not pay according to the schedule. And Dietec claims that Osirius's late payments forced it to incur greater costs to make the dies, including taking out a high-interest loan to cover the costs of supplies. Dietec also says that because Osirius did not pay on time, its financial condition became compromised to the point where it could not obtain other manufacturing contracts. Dietec sued Osirius to recover for, among other things, the increased costs it incurred to make the dies and the other jobs it lost.

Osirius has filed a motion to dismiss virtually all of Dietec's complaint. As to Dietec's breach-of-contract claim, Osirius asserts that the parties' transaction was governed by

Michigan's Uniform Commercial Code, that under the UCC sellers cannot recover consequential damages, and that the increased performance costs and lost jobs were consequential damages. Osirius further argues that Dietec's other four counts fail to state a claim upon which relief may be granted.

The Court agrees in part with Osirius. The UCC does govern Dietec's sale of dies, under the UCC sellers cannot recover consequential damages, and the jobs Dietec allegedly lost due to Osirius's alleged breach are consequential damages. But, as explained in detail below, Osirius has not persuaded the Court that Dietec's increased performance costs are consequential (as opposed to incidental) damages. As such, and for the reasons set forth below, the Court will grant in part and deny in part Dietec's motion.

**I.**

**A.**

Dietec is a South Korean company that makes press dies for auto parts. (R. 10, PID 58.) (A "press die" or "die" is a tool that shapes or molds material.) Half of Dietec's annual revenue comes from Groupe Renault, Nissan Motor Company, or the Renault-Nissan Alliance. (R. 10, PID 58.) Between 2010 and 2016, Dietec completed 22 contracts with one of these three entities. (R. 10, PID 58–59.) The average annual value of the contracts was over $8 million. (*Id.*)

In 2014, Renault, under the codename HHA Brasil Project, was developing a new sport utility vehicle. (R. 10, PID 56, 60.) Renault selected Dietec's bid to work on the project. (R. 10, PID 60.)

On October 8, 2014, Osirius, in its capacity as Renault's manufacturing consultant on the HHA Brasil Project, issued two purchase orders to Dietec. (R. 10, PID 56, 60; R. 12, PID 118, 120.) Osirius issued a third order to Dietec on March 13, 2015. (R. 12, PID 122.) Each purchase

order was for a number of dies, twelve in all. (*See* R. 12, PID 118–20.) The purchase orders provided the price Osirius would pay for each die. For example, for the die that would make the inner panel of the SUV's front door, Osirius agreed to pay $773,099. (*See* R. 12, PID 118.) The total amount Osirius was to pay Dietec under the three purchase orders was just over $9 million. (*See* R. 10, PID 63.)

Central to this case is that the purchase orders provided that the $9 million was to be paid according to the following schedule: Dietec would receive 10% upon invoicing, another 25% after casting, another 20% after producing the first sample, another 10% 60 days after that, another 25% after "buy off in Korea," and the final 10% "after Renault final approval." (R. 12, PID 118.) Dietec agreed to this payment schedule "for the very purpose of ensuring that it had enough cash on hand to cover the costs of the [p]roject." (R. 10, PID 61–62.) In particular, "as Dietec received funds from Osirius, it planned to use such funds to cover the costs of the proceeding stage [*sic*] of production." (R. 10, PID 64.) Dietec says that "[d]uring contract negotiations, Dietec informed Osirius of the manner in which Dietec planned to fund the [p]roject" and so Osirius "knew that Dietec had no other ready source of significant financing to cover its costs of production." (R. 10, PID 64.)

Although Osirius paid Dietec the initial 10% according to the payment schedule, Dietec says that the remainder of Osirius's payments were late. Dietec completed casting in March 2015 and thus 25% of the contract price, $2.26 million, became due. (*See* R. 10, PID 63.) Yet in May, June, and July 2015, Osirius's payments totaled only $800,000. (*See* R. 10, PID 63.) Although Osirius paid Dietec another $900,000 in August 2015, this meant that it still had paid only about $1.7 million of the $2.26 million owed for casting. (*See* R. 10, PID 63.) In October 2015, Osirius paid Dietec another $1.3 million. (*See* R. 10, PID 63.) But, by that time, Dietec had hit the first-

sample and 60-days-after-first-sample milestones, triggering those two payments (another 20% and 10%, respectively). (*See* R. 10, PID 63.) As such, Osirius was still not current under the payment schedule. Indeed, it was not until August 2016 that Osirius caught up: by that point it had paid Dietec a total of $8.5 million whereas a total of about $8.1 million had become due under the payment schedule. (*See* R. 10, PID 63.)

Despite Osirius's delayed payments, Dietec was able to "fulfill all its obligations under the parties' agreement, including the design, manufacture, packing, shipping, and installation of the [dies and samples] to the satisfaction of Osirius and Renault." (R. 10, PID 56.) Indeed, in October 2016, Renault gave its final approval, thereby obligating Osirius to pay Dietec the final 10% of the $9 million total. (*See* R. 10, PID 63.) As Osirius had already paid $8.5 million, Dietec was owed about $540,000 more. (R. 10, PID 63.) Dietec says that Osirius agreed to pay this remaining balance, but then never did so. (*See* R. 10, PID 69–70.)

Osirius's failure to pay according to the payment schedule made it more costly for Dietec to perform. Or, in Dietec's words, Osirius's breach "wreaked havoc" on "Dietec's ability to obtain required materials and to manufacture the [dies and samples] in a timely manner." (R. 10, PID 62.) In particular, Dietec's executives spent "significant time" to secure raw materials "without proper financing." (R. 10, PID 72.) Dietec was also "forced" to secure a "high interest" $1.8 million loan "to cover its costs of production and continue to perform under the [purchase orders]." (R. 10, PID 65.) Further, because Dietec scheduled its loan payments several days after it was slated to receive a payment from Osirius, when Osirius did not pay on time, Dietec incurred late fees on the loan. (*See* R. 10, PID 66, 72.) Not only that, but Dietec's lender also "lost confidence in Dietec's ability to repay the [l]oan." (R. 10, PID 66.) Osirius's failure to pay

according to the payment schedule also meant that Dietec could not use "standard" cost-saving strategies that it had factored into the die prices. (R. 10, PID 66.)

Dietec also claims that Osirius's failure to adhere to the payment schedule adversely affected (and still adversely affects) its ability to secure other jobs from Renault and Nissan, including the "LJC Project." In the summer of 2016, Renault accepted Dietec's bid to work on the LJC Project. And in September 2016, the Renault-Nissan Purchase Organization visited Dietec to evaluate Dietec's performance as a supplier; Dietec was given "excellent" scores by both Renault and Nissan. (R. 10, PID 68.) Around this time, the parties agreed on all "material terms" of the LJC Project, including a contract price of $6.5 million. (R. 10, PID 68.) On September 20, 2016, however, Renault informed Dietec that its "supplier rating with Renault and Nissan" had been decreased from "C" status to "D" status. (R. 10, PID 67.) Renault's email provided that the drop was not based on Dietec's manufacturing performance, but "entirely on Dietec's poor 2015 financials." (R. 10, PID 67.) A subsequent investigation by Dietec and Renault "revealed that the downgrade was caused by Osirius's delinquencies." (R. 10, PID 68.) Dietec says that because Osirius had not paid timely and had not paid the final $540,000 at all, it was "unable to immediately improve its financial condition." (R. 10, PID 68.) "Renault [thus] revoked its acceptance of Dietec's bid on the LJC Project." (R. 10, PID 69.) Further, because suppliers with a "D" status are barred from bidding on Renault or Nissan jobs (R. 10, PID 67), Dietec claims that it is losing over $8 million in contracts per year (R. 10, PID 69).

**B.**

Dietec filed this lawsuit to get Osirius to compensate it for the increased costs it incurred in making and delivering the dies for the HHA Brasil Project, for the other Renault and Nissan jobs it has lost as a result of its compromised financial condition (including the LJC Project), and

for the remaining $540,000 under the purchase orders. (*See* R. 10.) Dietec's amended complaint seeks this relief via five legal theories: breach of contract (the purchase orders), unjust enrichment (as a backup to the breach-of-contract claim), tortious interference with a contractual relationship (the LJC Project), tortious interference with business expectancies (the LJC Project and other Renault or Nissan jobs), and fraudulent inducement (that Dietec had no intent to pay on time when it issued the purchase orders). (*See* R. 10.)

Osirius has moved to dismiss almost all of Dietec's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Osirius asks the Court to dismiss Dietec's breach-of-contract claim insofar as the relief sought is anything other than the remaining $540,000 balance under the purchase orders. (R. 12, PID 99.) And, for multiple reasons, Osirius asks the Court to dismiss Dietec's four other counts in their entirety. (R. 12, PID 116.)

## II.

When, as here, a defendant moves to dismiss pursuant to Rule 12(b)(6), the plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), governs. Under that standard, a court first culls legal conclusions from the complaint, leaving only factual allegations to be accepted as true. *Iqbal*, 556 U.S. at 679. The inquiry then becomes whether the remaining assertions of fact "allow[] the court to draw the reasonable inference that the defendant is liable[.]" *Id.* at 678. Although this plausibility threshold is more than a "sheer possibility" that a defendant is liable, it is not a "'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Whether a plaintiff has presented enough factual matter to "'nudg[e]'" his claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 683 (quoting *Twombly*, 550 U.S. at 570).

**III.**

The Court begins with Osirius's arguments for partial dismissal of Dietec's breach-of-contract claim. It then turns to the parties' disputes over Dietec's unjust-enrichment, tortious-interference, and fraudulent-inducement claims—in that order.

**A.**

Osirius's argument regarding Dietec's breach-of-contract claim can be broken into two steps. One: the purchase orders were for the sale of goods and thus were governed by Article 2 of Michigan's Uniform Commercial Code. (R. 12, PID 99–100.) Two: under the UCC, sellers are not entitled to consequential damages and, aside from the outstanding balance of $540,000, Dietec only seeks to recover consequential damages. (R. 12, PID 101–02.)

Osirius's first step is correct; its second only partly so.

**1.**

Article 2 of the UCC only governs contracts for goods. *See* Mich. Comp. Laws § 440.2102. But this does not mean a contract has to be solely for goods for the UCC to apply. Rather, under the predominate-factor test, "[i]f the purchaser's ultimate goal is to acquire a product, the contract should be considered a transaction in goods, even though service is incidentally required." *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 622 (Mich. 1992). Whether a transaction was predominately for goods is a question of fact, *Higgins v. Lauritzen*, 530 N.W.2d 171, 173 (Mich. Ct. App. 1995), so, on a motion to dismiss, it must be implausible that the purchase orders were predominately for services for the Court to conclude that the UCC governed the parties' transaction.

Although not casting its argument in plausibility terms, Dietec argues that the purchase orders were not predominately for goods. From Dietec's perspective, the purchase orders were a

"consulting agreement" where Osirius, as manager of the HHA Brasil Project, directed Dietec in the use of its knowledge and expertise. (R. 14, PID 143.) Dietec points out that the purchase orders state, "*services* to be provided: 1. Dietec Co. Ltd. will be designing and manufacturing dies." (R. 12, PID 118 (capitalization altered, emphasis added); R. 14, PID 144.) And, under the purchase orders, Dietec was to provide Osirius with "all data," including 2D and 3D simulations and documentation on a weekly basis. (R. 14, PID 144.) Further, Dietec agreed to be "solely responsible for the design and manufacture" of the dies and stipulated that it was not relying on any design or manufacturing information from Osirius. (R. 12, PID 118.) Thus, says Dietec, the purchase orders were "a contract for services to which the UCC does not apply." (R. 14, PID 145.)

The Court disagrees. To be sure, the aspects of the purchase orders highlighted by Dietec suggest that Dietec agreed to provide some services. But other aspects of the purchase orders reveal that Osirius's ultimate goal was to acquire the dies. To start, they were titled "Purchase Order"—a designation "almost exclusively used for transactions in goods." *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1331 (11th Cir. 1998). And, consistent with their title, under the category "part number or description," the purchase orders list dies, i.e., goods. And for each die listed (e.g., the one that would make inner panels for front doors), the purchase orders provide a price (e.g., $773,099). In other words, Osirius agreed to pay a fixed amount per die— not a per-day amount which would suggest a service. *Cf. Conopco, Inc. v. McCreadie*, 826 F. Supp. 855, 871 (D.N.J. 1993) (finding that per-day compensation indicated that agreement was for a service). The purchase orders further provide that "in the event of termination," Osirius was entitled to enter Dietec's facilities and seize the "dies and related parts and materials (including intellectual property)." (R. 12, PID 119.) This further suggests that what Osirius ultimately

wanted was goods, not services. Finally, the purchase orders provide a "ship via" designation with the "FOB" being the Parangua Port in Brazil. Goods—not services—are shipped. *See BMC Indus.*, 160 F.3d at 1331 (finding that "term 'F.O.B. Barth dock'" indicated sale of goods not services).

In the course of researching the issue, the Court came across two decisions (neither of which Dietec cites) that are somewhat factually similar yet reach a different result. They are thus worth explicitly distinguishing. In *C & S Electrical Services, Inc. v. Acemco, Inc.*, the trial court found that the transaction was predominately for services even though the electrical system was bought via purchase order. No. 289094, 2010 WL 2793539, at *2 (Mich. Ct. App. July 15, 2010). But—and this is not the situation here—the seller did not manufacture the components for the electrical system and the components had value to the buyer only if the seller installed them as part of the system in the buyer's plant. *Id.* Moreover, the Michigan Court of Appeals in *C & S Electrical* merely found that the trial court did not "clearly err" in finding the contract predominately for services—it might well have been predominately for goods, just not clearly so. *See id.* In *Home Insurance Co. v. Detroit Fire Extinguisher Co.*, the Michigan Court of Appeals found that the trial court erred in holding, as a matter of law, that the contract was predominately for services. 538 N.W.2d 424, 427–28 (Mich. Ct. App. 1995). But there, unlike here, the contract "contemplate[d] regular servicing and testing of the system after installation." *Id.* at 428.

In sum, while Dietec has identified portions of the purchase orders that indicate that the parties contracted for some services, a more holistic reading of the purchase orders reveals that Osirius's "ultimate goal," *Neibarger*, 486 N.W.2d at 622, was to obtain dies, i.e., goods. Thus, it is implausible that the UCC did not govern the parties' transactions, i.e., the UCC applies as a matter of law.

**2.**

This leads to the second step of Osirius's argument: that sellers like Dietec cannot recover consequential damages under the UCC and, aside from the outstanding balance under the purchase orders, all of the contract damages Dietec seeks are of the consequential variety. (R. 12, PID 101–02.)

Dietec does not take this argument head on. (*See* R. 14, PID 146.) It does not argue that sellers are permitted to recover consequential damages under the UCC; nor does it directly argue that its increased costs to make and deliver the dies and the lost Renault and Nissan work are not consequential damages. Instead, Dietec argues that Michigan Compiled Laws § 440.2708(2), permits it to recover these damages. (*See* R. 14, PID 146.)

To appreciate Dietec's reliance on § 440.2708(2), it is helpful to place that statutory provision in context and then review its language. The first subsection of § 440.2708 (essentially) provides that if a buyer wrongfully does not accept the goods or repudiates the contract, the "measure" of the seller's damages "is the difference between the market price . . . and the unpaid contract price," together with any incidental damages. Subsection (2)—the provision upon which Dietec relies—then provides:

> *If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit* (including reasonable overhead) *which the seller would have made from full performance by the buyer,* together with any incidental damages provided in this article (section 2710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

Mich. Comp. Laws § 440.2708(2) (emphases added). Apparently, it is Dietec's position that it should be able to recover for the increased costs it incurred to complete the HHA Brasil Project and the Renault and Nissan jobs it lost because those damages are part of the "profit . . . which the seller would have made from full performance by the buyer." (*See* R. 14, PID 146 ("The

UCC thus does not shield Osirius from liability for Dietec's *lost profits* which were caused by Osirius's breaches of contract and tortious conduct." (emphasis added)).)

Part of the problem with Dietec's argument is that the term "profit" in § 440.2708(2) does not include consequential damages. As quoted above, § 440.2708(2) lists "profit," "incidental damages," and "due allowance for costs reasonably incurred" as three components that a seller may recover—it does not list "consequential damages." In contrast, certain *buyer* remedy provisions under the UCC explicitly list both incidental *and* consequential damages. Mich. Comp. Laws § 440.2712; Mich. Comp. Laws § 440.2713. In other words, the drafters of the UCC explicitly provided that buyers were entitled to both incidental and consequential damages but limited sellers to incidental damages. *See Firwood Mfg. Co. v. Gen. Tire, Inc*., 96 F.3d 163, 169 & n.1 (6th Cir. 1996) (comparing seller's and buyer's remedy provisions under the UCC and concluding that "sellers are entitled to incidental, but not consequential damages"); *S. C. Gray, Inc. v. Ford Motor Co.*, 286 N.W.2d 34, 44 (Mich. Ct. App. 1979) ("The U.C.C. does not allow the seller to recover consequential damages."). Thus, the Court does not read § 440.2708(2), including its use of the term "profit," to permit sellers to recover consequential damages.

But, Dietec might argue, if that is so, then why does § 440.2708(2) suggest that its purpose is to "put the seller in as good a position as performance would have done"? It appears that another provision of the UCC answers this question. It says, "The remedies provided in this act must be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed *but* neither *consequential* or special damages nor penal damages may be had *except as specifically provided in this act* or by other rule of law." Mich. Comp. Laws § 440.1305 (emphasis added). So § 440.2708(2) permits Dietec to

11

recover damages that would put it in as good a position as Osirius's performance would have—so long as those damages are not of the consequential variety.

Thus, the Court finds that § 440.2708(2) does not permit Dietec to recover consequential damages. But that conclusion does not end the inquiry. Instead it leads to two questions. Are the lost Renault and Nissan jobs, including the LJC Project, consequential damages? And are the increased costs Dietec incurred to finish the HHA Brasil Project after Osirius did not pay on time consequential damages? If the answers to these questions are "no," then presumably Dietec may recover them under the UCC as either direct or incidental damages.

There is no bright line that separates consequential from direct or incidental damages. But the case law and treatises mark the boundary well enough for present purposes. Consequential damages have been described as those "beyond the immediate scope of the contract." *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (emphasis added); *see also Atlantech Inc. v. Am. Panel Corp.*, 743 F.3d 287, 293 (1st Cir. 2014) (quoting *Penncro* with approval); *Atl. City Assocs., LLC, v. Carter & Burgess Consultants, Inc.*, 453 F. App'x 174, 179 (3d Cir. 2011) (quoting *Penncro* with approval); *S. C. Gray, Inc. v. Ford Motor Co.*, 286 N.W.2d 34, 43 (Mich. Ct. App. 1979) ("'[C]onsequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the nonbreaching party in its dealings, often with third parties[.]'" (quoting *Petroleo Brasileiro, S. A., Petrobras v. Ameropan Oil Corp.*, 372 F. Supp. 503, 508 (E.D.N.Y. 1974)). And it has also been said that direct damages are those that a reasonable contracting party would expect to result from his breach even without knowledge of special circumstances; in contrast, consequential damages are those that the reasonable contracting party can expect only with knowledge of special circumstances. *See* Corbin on Contracts § 56.6 (2017); White, Summers, & Hillman,

Uniform Commercial Code § 7:21 (6th ed.) (discussing direct and consequential damages in context of buyer's remedies); Mich. Comp. Laws § 440.2715 (providing that a buyer's consequential damages "include" unavoidable losses stemming from "particular requirements and needs" of which the seller was aware).

Taking first Dietec's claim that Osirius should compensate it for the Renault and Nissan jobs it lost (including the LJC Project), it is not plausible that these damages are anything but consequential. Dietec says that because Osirius did not adhere to the payment schedule in the purchase orders, its financial condition became compromised which, in turn, prevented it from obtaining *other* work from Renault or Nissan—i.e., work outside the scope of the purchase orders. Indeed, Dietec admits as much: "The adverse impact of Osirius's prodigious and multiple material breaches of the contract *reached well beyond Dietec's day-to-day operations of the HHA Brasil Project*, it also negatively impacted Dietec's ability to obtain new work, as its financial performance played a key role in its ability to win bids." (R. 10, PID 66 (emphasis added).) As for the other description of consequential damages, Dietec has not pled facts showing that a buyer who is unaware of the manufacturer's special circumstances would still anticipate that failing to make timely payments on one project would damage the manufacturer's financial record to the point where it could not obtain other jobs. *See Afram Exp. Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1368–69 (7th Cir. 1985) (providing that if buyer's breach caused seller to fall into bankruptcy such harm would be consequential), *abrogated on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991). Accordingly, the Court finds that to the extent that Osirius's alleged breach of the purchase orders caused Dietec to lose jobs, those damages are consequential and not recoverable under the UCC. *See Penncro Assocs.*, 499 F.3d at 1156 (indicating that a breach precluding the plaintiff "from performing *other* work

for which it had contracted and from which it expected to make a profit" were consequential damages (emphasis added)); *Tractebel Energy*, 487 F.3d at 109 (indicating that if a plaintiff's ability to "generate profits on collateral transactions" is "contingent on the performance of the primary contract," those profits are consequential damages).

This leaves the other component of damages that Osirius claims is consequential: the increased costs that Dietec incurred to make and deliver the dies for the HHA Brasil Project following Osirius's failure to pay according to schedule. Although the explanation is a bit involved, the Court ultimately concludes that Osirius has not shown these damages to be consequential.

To start, these increased performance costs do not fit neatly in the two descriptions of consequential damages provided above. In fact, they do not fit the first description at all. According to Dietec, extra time was spent to secure "raw materials" (presumably to make the dies) and the $1.8 million loan was "to cover its costs of production and continue to perform." (R. 10, PID 65, 71.) Thus, the increased costs were not "beyond the immediate scope of the contract," *Penncro*, 499 F.3d at 1156, and not consequential by that measure. True, the increased costs come closer to fitting the other description of consequential damages. But a contracting party, even without any special knowledge of Dietec's financial condition, might well anticipate that its failure to make timely payments pursuant to a very specific payment plan would up the costs to complete the job. Otherwise, why would the manufacturer have bargained for payments during the course of manufacture?

And aside from not fitting neatly in the consequential-damages bucket, Dietec's increased performance costs fit better in a damages bucket the UCC permits sellers to recover: the one labeled "incidental damages."

Although the UCC does not define "incidental damages," it does say what that term includes. For aggrieved sellers, the UCC says that incidental damages "include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." Mich. Comp. Laws § 440.2710. Analogously, an aggrieved buyer's incidental damages "include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." Mich. Comp. Laws § 440.2715. These two statutory provisions thus suggest that incidental damages are commercially reasonable costs the non-breaching party incurs in processing the goods to mitigate its losses (e.g., storing, reselling, or inspecting the goods, or buying substitutes). *See* Restatement (Second) of Contracts § 347 cmt. c (1981) ("Incidental losses include costs incurred in a reasonable effort . . . to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction.").

Under this definition, it is plausible that the extra costs Dietec incurred to make and deliver the dies are incidental damages. The UCC provides that if a buyer "fails to make a payment due on or before delivery or repudiates," Mich. Comp. Laws § 440.2703, and if the "goods are unfinished," "an aggrieved seller may in the exercise of reasonable commercial judgment *for the purposes of avoiding loss and of effective realization* . . . complete the manufacture and wholly identify the goods to the contract," Mich. Comp. Laws § 440.2704 (emphasis added). In other words, the UCC permits the seller to complete the job following the buyer's breach if it is reasonable to do so to mitigate losses. And, reading the amended complaint

in the light most favorable to Dietec, it is reasonable to infer that completing the job was reasonable compared to the alternative: stopping work and selling die parts for scrap. So if incidental damages are defined as a seller's reasonable costs of processing the contracted goods to mitigate its losses, Dietec's increased costs to make and deliver the dies are plausibly "incidental" and recoverable under the UCC.

But that is not the only possible definition of a seller's incidental damages under the UCC. In *Afram Export Corp. v. Metallurgiki Halyps*, the Seventh Circuit suggested that the line between incidental and consequential damages under the UCC should be drawn by asking if the damages were "obvious to the buyer and unavoidable by the seller." 772 F.2d 1358, 1369 (7th Cir. 1985), *abrogated on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225 (1991). If yes, then incidental; if no, then consequential. *See id.*

Although *Afram*'s definition of incidental damages is different than the one this Court synthesized from the incidental-damages provisions of the UCC, the increased costs Dietec incurred to complete the purchase orders appear to fit *Afram*'s definition too. Indeed, *Afram* suggests as much. There, Afram had contracted to sell scrap metal to Metallurgiki. 772 F.2d at 1361. To buy the junk cars that it would use to produce the scrap, Afram borrowed $2.5 million. *Id.* at 1368. When Metallurgiki refused the scrap, Afram sued and sought (among other things) the interest it paid on the loan between Metallurgiki's breach and when it sold the scrap to another buyer. *See id.* Although ultimately not deciding whether Afram's interest payments were incidental damages (because it found Afram was not "really complaining about an extra interest expense"), the Seventh Circuit suggested that they were:

> if we had to decide [the issue], we probably would disagree with the district judge, who regarded this as a case of consequential rather than incidental damages. Although knowledge of the details of the seller's financial arrangements is not chargeable to the buyer, *it is obvious to the buyer and unavoidable by the*

*seller that the seller will incur an interest cost . . . in the interval between the breach of the contract and the cover sale*; and the party who is better able to avoid this expense and who therefore should bear the risk of its occurrence is the contract-breaking buyer, not the seller.

*Afram*, 772 F.2d at 1369 (emphasis added). The appellate court concluded, "The cases therefore allow the seller to recover the additional interest expense as incidental damages." *Id.*

And in one of "[t]he cases" referenced by the *Afram* court, the Second Circuit found damages similar to Dietec's increased performance costs to be "incidental" under New York's UCC. *See Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.*, 697 F.2d 481 (2d Cir. 1983). In particular, Bulk had agreed to sell Sun about $4 million in fuel but needed to first buy the fuel from a third party. *Id.* at 482. It did so by taking out a loan for "almost all of the cost." *Id.* When Bulk's deal with Sun fell through, Bulk sued and sought, among other things, the interest it had paid on the loan following Sun's breach. *See id.* 482–83. The Second Circuit held that those interest payments were "incidental damages under UCC." *Id.* at 484.

To sum up the analysis to this point, because the increased costs Dietec incurred to make and deliver the dies for the HHA Brasil Project do not fit neatly in either of the two descriptions of consequential damages set out above, and because they fit better in the two definitions of incidental damages (one synthesized from the UCC's incidental damages provisions, the other set out in *Afram*), it seems as though Dietec may recover its increased performance costs as incidental damages.

But Osirius cites a Sixth Circuit case, *Firwood Manufacturing Co. v. General Tire, Inc.*, 96 F.3d 163 (6th Cir. 1996), that suggests these could be consequential damages. There, Firwood agreed to sell General Tire 55 machines (each valued at about $30,000). *Id.* at 165. General Tire only paid for 22. *See id.* at 166. Firwood sold the remaining 33 machines but, save for a few, not until three years later. *Id.* A jury awarded Firwood about $190,000 for having to sell the

machines at less than what General Tire had agreed to pay and, as relevant here, about $100,000 to compensate it for the interest it would have earned from investing General Tire's payment had General Tire paid when it had agreed to. *See id.* at 166, 169. The district court, analogizing Firwood's lost investment opportunity to the interest expense in *Bulk Oil*, found that Firwood could recover its lost investment as incidental damages. *Id.* at 169–70. The Sixth Circuit disagreed. It reasoned that *Bulk Oil* was based on New York's interpretation of the UCC but that Michigan had "define[d] incidental damages much more narrowly." *Id.* at 169. It also found *Bulk Oil* unpersuasive because, by asking whether the interest costs were foreseeable, the *Bulk Oil* court had conflated incidental and consequential damages. *Id.* at 169 n.2. The Sixth Circuit reasoned, "Since Michigan considers interest paid on loans to be a consequential damage, not an incidental damage, and since sellers may not seek consequential damages, Firwood could not have sought to collect interest payments on a loan to pay for the raw materials in the machines it was to build for General Tire. Nor could it seek the economic equivalent—its lost use of money." *Id.* at 171.

Read broadly, *Firwood* would at least foreclose Dietec from recovering the interest and fees it paid on the $1.8 million it borrowed to complete its performance; but this Court does not read *Firwood* so broadly. At issue in *Firwood* was not extra expenses Firwood paid to resell the 33 machines—it was three years' worth of interest Firwood could have earned had General Tire paid when it said it would. In other words, *Firwood* was not trying to recover increased performance costs under the contract due to General Tire's breach, but instead a lost investment. Moreover, in support of its assertion that Michigan had "define[d] incidental damages much more narrowly" than New York, the *Firwood* court cited *S. C. Gray, Inc. v. Ford Motor Co.*, 86 N.W.2d 34 (1979). But the issue in *S. C. Gray* was whether the seller could recover interest it

paid on money it borrowed "to carry on its business" after the buyer did not pay under a pair of contracts. 86 N.W.2d at 34. Apparently then, the loan in *S. C. Gray* fit within the two descriptions of consequential damages set out above: it was "beyond the immediate scope of the [two] contract[s]," *Penncro*, 499 F.3d at 1156, and only foreseeable with knowledge of the seller's unique financial situation. Finally, in holding that the lost value of money was a consequential as opposed to an incidental damage, *Firwood* cited and discussed *Afram* with approval. 96 F.3d at 171. As discussed above, *Afram* suggested that interest paid following a buyer's breach was an incidental damage. For all these reasons, the Court does not find that *Firwood* dictates that the increased costs Dietec incurred to manufacture the dies following Osirius's failure to adhere to the payment schedule are consequential damages under the UCC.

* * *

In sum, the UCC governed the parties' transactions pursuant to the purchase orders. Under the UCC, a seller is not entitled to consequential damages. The Renault and Nissan jobs that Dietec allegedly lost due to Osirius's failure to pay according to the payment schedule were consequential damages. In contrast, at least to the extent that completing the HHA Brasil Project was "the exercise of reasonable commercial judgment for the purposes of avoiding loss and of effective realization," Mich. Comp. Laws § 440.2704, Osirius has not persuaded the Court that the increased costs Dietec incurred to perform are consequential. Thus, Dietec's breach-of-contract claim is dismissed only insofar as it seeks to recover for lost jobs.

**B.**

Osirius says that Dietec's unjust-enrichment count must be dismissed because the only relief Dietec seeks in that count—the $540,000 balance under the purchase orders—is relief Dietec seeks in its breach-of-contract count. (R. 12, PID 112.)

In response, Dietec concedes it is not entitled to "double recovery." (R. 14, PID 152.) But, says Dietec, it would be "premature" for the Court to limit it to a breach-of-contract claim since "one interpretation" of Osirius's failure to pay the remaining balance under the purchase orders is that Osirius "believes the [purchase orders are] somehow invalid." (R. 14, PID 152.) And, Dietec believes, if it turns out the purchase orders were invalid, Osirius should have to pay for the dies under an unjust-enrichment theory. So Dietec seeks to maintain an unjust-enrichment claim in the alternative to its breach-of-contract claim. (R. 10, PID 77.)

It is not entirely clear to this Court what a defendant must concede about an express contract for a court to dismiss a plaintiff's implied-contract theories at the pleading stage. A case cited by Osirius states, "A plaintiff can only plead breach of contract and implied contract claims in the alternative if there is doubt as to the *existence* of a contract." *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 824, 834 (E.D. Mich. 2014) (emphasis added); *see also Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp. 484, 491 (E.D. Mich. 1993) ("[A]lternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the *existence* of a contract." (emphasis added)). But—and it may just be a matter of semantics—a contract might in a sense exist but be unenforceable or invalid. For instance, a plaintiff may (at least in some instances) recover "on a quantum meruit theory where the plaintiff has performed services under an express agreement which is not enforceable because of the statute of frauds or some other statute that prevents recovery on the terms of the agreement itself." *Geistert v. Scheffler*, 25 N.W.2d 241, 243 (Mich. 1946); *see also* 42 C.J.S. Implied Contracts § 65 (stating, but not relying on Michigan cases, that "[d]espite the existence of an express contract, a party may recover under quantum meruit if the contract is unenforceable, invalid, or void"). Thus, it might be more precise to say that a plaintiff cannot plausibly plead an

implied contract claim when a defendant concedes that the parties' obligations were and are governed by a contract asserted by the plaintiff, i.e., that the contract not only exists but is valid and enforceable. *Cf. Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 182 (6th Cir. 1996) ("[I]f All–Lock admits to the existence of a *valid* contract such that whether a contract exists is not at issue for the factfinder, then it will be appropriate for the district court to dismiss Terry Barr Sales' claims for unjust enrichment and promissory estoppel at that time." (emphasis added)); *H.J. Tucker & Assocs., Inc. v. Allied Chucker & Eng'g Co.*, 595 N.W.2d 176, 188 (Mich. Ct. App. 1999) ("[A] contract cannot be implied in law while an express contract covering the same subject matter is in *force* between the parties. . . . In the present case, the trial court could have found that an express contract was originally formed between the parties but that subsequently the contract was no longer in force." (emphasis added)).

The Court need not wade into this issue further. True, Osirius implies Dietec's ability to plead as an alternative turns solely on whether the parties "dispute the existence of a contract." (R. 14, PID 173.) But Osirius also quotes the following form *Terry Barr*: "Where the parties have an *enforceable* contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel and unjust enrichment." 96 F.3d at 181 (emphasis added); *see also* (R. 12, PID 112). Osirius then says, "Osirius does not dispute the parties entered into the Purchase Orders, it disputes the terms, scope, and effect of the Purchase Orders, and that Osirius breached the Purchase Orders." (R. 12, PID 113.) Accordingly, the Court understands Osirius to concede that the purchase orders governed and continue to govern the parties' obligations (including payment) and only disputes what those obligations were and whether it complied with them. Accordingly, the difference between the mere existence of a contract and the existence of a valid, enforceable contract—if there is one—can be addressed another day.

In sum, given that Osirius apparently concedes that the purchase orders govern the parties' obligations with respect to the $540,000 balance, the Court will dismiss Dietec's unjust-enrichment claim. To the extent that Osirius's answer or discovery shows that it did not intend to make that concession, Dietec can file a motion to reassert its unjust-enrichment claim.

## C.

The Court next turns to Dietec's two tortious-interference counts.

Dietec's claim that Osirius tortiously interfered with a contract claim is based on losing the LJC Project. Dietec's claim that Osirius tortiously interfered with business expectancies is based on losing Renault and Nissan work generally, including the LJC project. Dietec says that Osirius committed these two torts by (1) failing to adhere to the payment schedule in the purchase orders (which caused Dietec's financial condition to become compromised) and (2) misrepresenting to Renault that Dietec was to blame for the delays in the HHA Brasil Project (when, in fact, the delays were due to Osirius's failure to pay timely). (*See* R. 10, PID 73, 75.)

The Court separately considers the two factual bases for Dietec's tortious interference claims.

### 1.

In response to Dietec's assertion that Osirius misrepresented to Renault that Dietec was responsible for the production delays (*see* R. 10, PID 64), Osirius asserts that Dietec has not adequately pled the required causal connection between that misrepresentation and lost jobs (R. 14, PID 110 & n.13).

Osirius is correct on the law. Both tortious interference claims require the plaintiff to show that the defendant's conduct caused the broken contract or lost business expectancy. *See*

*BPS Clinical Labs. v. Blue Cross & Blue Shield of Michigan*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996); *Dzierwa v. Michigan Oil Co.*, 393 N.W.2d 610, 613 (Mich. Ct. App. 1986).

And Osirius is correct on the facts. In particular, the timeline suggested by the amended complaint, along with Dietec's allegations about how it lost the LJC Project, shows that any misrepresentations that Osirius made about Dietec's performance on the HHA Brasil Project did not cause Dietec to lose Renault or Nissan jobs. The amended complaint provides a chart indicating that the bulk of the work on the HHA Brasil Project was performed in 2015, that the project was nearly complete by the fall of 2016, and that it was entirely complete by October 30, 2016. (*See* R. 10, PID 63.) So if Osirius blamed Dietec for project delays, it appears that it did so in 2015 or the first half of 2016. And this is significant because Renault selected Dietec's bid on the LJC Project in July 2016 and—as of September 15, 2016—Renault still intended to have Dietec work on the LJC Project. (*See* R. 10, PID 64, 68.) Apparently then, Renault had looked past any misrepresentations Osirius made about Dietec's manufacturing performance to award Dietec new work. Indeed, Dietec pleads that it was able to complete the HHA Brasil Project "to Renault's complete satisfaction" (R. 10, PID 64), and all but explicitly says that the sole reason it lost the LJC Project was due to its financial condition (*see* R. 10, PID 67–68). Taking all of this together, it is not plausible that Osirius's misrepresentations caused Dietec to lose the LJC Project. And the causal chain between Osirius's misrepresentations and other Renault or Nissan work is at least as weak.

Accordingly, to the extent that Dietec's two tortious-interference counts are based on Osirius's misrepresentations to Renault about Dietec's performance on the HHA Brasil Project, they fail to state a claim upon which relief may be granted.

**2.**

The remaining factual basis underlying Dietec's two tortious-interference counts is Osirius's failure to adhere to the payment schedule (which allegedly resulted in Dietec's supplier status dropping from "C" to "D" and rendered Dietec ineligible for Renault or Nissan work). Whether this pleads a tortious-interference claim turns not on causation but on intent.

Both tortious-interference claims require a plaintiff to show that the defendant acted "for the purpose of invading plaintiff's contractual rights or business relationship." *Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. Ct. App. 1984); *see also Knight Enterprises v. RPF Oil Co.*, 829 N.W.2d 345, 348–49 (Mich. Ct. App. 2013) ("'If the actor does not have [the purpose to cause the result], his conduct does not subject him to liability . . . even if it has the unintended effect of deterring the third person from dealing with the other.'" (quoting Restatement Torts § 766 cmt. d (1939)); *Badiee v. Brighton Area Sch.*, 695 N.W.2d 521, 539 (Mich. Ct. App. 2005) (finding that tortious-interference-with-contract claim failed as a matter of law where plaintiff had not shown that defendant had the "intent to interfere with the [plaintiff's] contracts"). For the intent requirement to be satisfied, it need not be the case that the sole purpose behind the defendant's conduct was to interfere with the plaintiff's contract or business expectancy. *See* Restatement (Second) Torts § 766 cmt. j. (1979). In fact, the intent element is satisfied even when interference is incidental to the defendant's purpose but the defendant knew that interference would be "a necessary consequence of his action." *Id.*

Here, Dietec has not adequately pled that part of the reason Osirius did not pay according to schedule was to compromise Dietec's financial condition so that Dietec could not obtain other Renault or Nissan work. Indeed, the amended complaint gives almost no insight into why Osirius's payments were untimely other than to suggest that Osirius had "financial issues." (*See*

R. 10, PID 61.) And even though Osirius likely knew that paying late would increase Dietec's costs in completing the HHA Brasil Project, this does not mean that Osirius knew that "a necessary consequence" of its failure to pay on time would be that Dietec's financial condition would be compromised to the point where it was ineligible for other Renault or Nissan work. Accordingly, Dietec has not adequately pled that Osirius did not pay according to the payment schedule "for the purpose of invading [Dietec's] contractual rights or business relationship," *Feldman*, 360 N.W.2d at 886. Thus, to the extent that Dietec's tortious-interference counts are based on Osirius's late payments during the HHA Brasil Project, Dietec has also not stated a claim upon which relief may be granted.

## D.

Dietec's fraudulent-inducement claim can be addressed without extended analysis. Dietec says that Osirius fraudulently induced it to agree to the terms in the purchase orders by promising to pay according to the payment schedule. (R. 10, PID 76.) But generally, fraudulent-inducement claims must be based on a misstatement about "an existing fact"—not a promise to do something in the future. *Custom Data Sols., Inc. v. Preferred Capital, Inc.*, 733 N.W.2d 102, 104–05 (Mich. Ct. App. 2006) (internal quotation marks omitted). True, there is an exception if, at the time the promisor made the promise, it did not intend to follow through. *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 156 (Mich. Ct. App. 2004). Attempting to invoke this exception, Dietec pleads as follows: "Osirius represented that it would pay Dietec in six separate payment installments and in accordance with the Payment Schedule at ¶ B of the Purchase Orders when it had no intention of honoring its contractual obligation to pay Dietec pursuant to the Payment Schedule." (R. 10, PID 76.) But this allegation is just a "[t]hreadbare recital[] of the element[] of

a cause of action." *Iqbal*, 556 U.S. at 678. It thus does not suffice to show that Osirius fraudulently induced Dietec to agree to the terms in the purchase orders.

## IV.

For the reasons given, the Court GRANTS IN PART and DENIES IN PART Osirius's motion to dismiss. To the extent that Dietec seeks to recover for Renault, Nissan, or Renault-Nissan Alliance work it lost, Dietec's breach-of-contract claim is DISMISSED WITH PREJUDICE. The claim is not dismissed insofar as it seeks the remaining unpaid balance under the purchase orders ($539,404.21) or the extra costs Dietec incurred to perform under the purchase orders caused by Osirius's alleged breach. Dietec's unjust-enrichment and two tortious-interference claims are DISMISSED WITHOUT PREJUDICE. Unless Dietec moves to amend its complaint by January 19, 2018, these three counts will be dismissed with prejudice without further order from the Court. Dietec should not file a motion to amend unless it can in good faith fully account for not only the pleading deficiencies identified by this Court, but also those raised by Osirius and not addressed in this opinion. Dietec's fraudulent-inducement claim is DISMISSED WITH PREJUDICE.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: December 6, 2017           U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 6, 2017.

s/Keisha Jackson
Case Manager